# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| JOHN DAVID MORRIS, STEVEN JOSEPH FLECK, ROSE MORRIS, and DIANE MARIE FLECK, | § § § § | |
| Plaintiffs, | § § | |
| v. | § | No. 3:05-cv-0015-M |
| CESSNA AIRCRAFT COMPANY, | § § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Cessna Aircraft Company's Motion for Summary Judgment [Docket Entry #66]. For the reasons stated below, the Motion is **GRANTED** in part and **DENIED** in part.

### I.      BACKGROUND

On January 24, 2003, a Cessna C208B model aircraft crashed near San Angelo, Texas, injuring the plane's two occupants, Plaintiffs John David Morris and Steven Joseph Fleck. The plane was owned by Federal Express Corporation ("FedEx") and was being operated by Baron Aviation Services, a FedEx "feeder operation" that employed Fleck and Morris as pilots. Morris and Fleck were conducting a "check ride," which is a test that pilots of air carriers must complete annually to maintain their flight status. *See* 14 C.F.R. 135.293(b) (2010). Fleck was acting in his capacity as a "check pilot"—a pilot authorized by the FAA to evaluate and determine pilot competence—and was observing and evaluating Morris's operation of the plane through several maneuvers. The crash occurred shortly after Morris attempted to complete a simulated engine

failure maneuver.

On January 4, 2005, Plaintiffs filed a Complaint in this Court, asserting common law claims for products liability based on strict liability and negligence, and breach of warranty, and seeking compensatory and punitive damages. (Compl. 3–7, ECF No. 1.) On December 19, 2005, this case was transferred by the Panel on Multidistrict Litigation to the District of Kansas (the "MDL Court") for coordinated and consolidated pretrial proceedings. (Transfer Order, ECF No. 15.) On March 12, 2007, Plaintiffs filed an Amended Complaint in the MDL court, asserting the same claims alleged in the original Complaint, and adding a common law fraud claim. (Am. Compl., *In re Cessna 208 Series Aircraft Prods. Liab. Litig.*, No. 2:05-md-01721-KHV (D. Kan. Apr. 12, 2007), ECF No. 189.) On April 22, 2010, the Panel on Multidistrict Litigation remanded the case to this Court.

Neither the Original nor the Amended Complaint provides much detail about Plaintiffs' products liability claims. Plaintiffs' strict liability allegations generally assert that the C208B was "defective, not fit for its intended purposes and unreasonably dangerous by reason of defective design, manufacture, assembly, inspection, testing, warning, instruction, sale, service, repair and/or maintenance." (Am. Compl. 3.) As for Plaintiffs' negligence-based products claim, the Amended Complaint alleges that Cessna breached its duty to exercise reasonable care in the design, manufacture, assembly, sale, and/or distribution of the aircraft, and also breached additional duties, imposed by federal regulations, concerning design, manufacture, testing, instructions for use, and warnings. (Am. Compl. 4–5.)

Notwithstanding these general allegations, the parties' briefing on Cessna's Motion for Summary Judgment reveals that Plaintiffs' allegations principally concern the C208B's capacity to operate in "icing conditions"; that is, conditions conducive to the accumulation of ice on the

exterior surfaces of the aircraft, which can adversely affect the aircraft's performance.  Plaintiffs'

common law fraud claims assert that Cessna misrepresented the C208B's performance

capabilities in icing conditions.

On June 20, 2011, Cessna filed its Motion for Summary Judgment, seeking judgment as a

matter of law on all of Plaintiffs' claims.

## II.      SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  If a reasonable jury could return a verdict for the non-moving party, then there is a

genuine dispute of material fact.  *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d

404, 417 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The

moving party bears the initial burden of identifying those portions of the record that demonstrate

the absence of a genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986); *Lynch Props., Inc. v. Potomac Ins. Co.,* 140 F.3d 622, 625 (5th Cir. 1998).  Once the

movant carries its initial burden, the burden shifts to the nonmovant to show that summary

judgment is inappropriate, by designating specific facts beyond the pleadings that prove the

existence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at

250; *Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991).  In determining whether a

genuine dispute of material fact exists, "factual controversies are construed in the light most

favorable to the nonmovant, but only if both parties have introduced evidence showing that a

controversy exists."  *Lynch Props.*, 140 F.3d at 625 (citation omitted).

## III.      ANALYSIS

Cessna seeks summary judgment on all of Plaintiffs' claims.  Cessna argues that the

Federal Aviation Act (FAAct) of 1958 preempts the standard of care for Plaintiffs' products liability claims, and that the federal standard of care is defined by, and satisfied through compliance with, federal regulatory standards for aircraft design and performance.  Similarly, Cessna argues that as a matter of law, its compliance with such standards precludes Plaintiffs from recovering punitive damages.  Cessna further argues that Plaintiffs' breach of warranty claim is barred by the statute of limitations, and that there are no genuine issues of material fact as to Plaintiffs' fraud claim.  Finally, Cessna seeks summary judgment on its affirmative defense of joint enterprise, by which it asserts that there is no dispute of fact that Morris and Fleck were engaged in a joint enterprise during the check flight, and that the negligence of one is imputed to the other.

A.      Products Liability Claims—Preemption

The "ultimate touchstone" in any preemption case is congressional intent.  *Wyeth v. Levine*, 555 U.S. 555, 129 S. Ct. 1187, 1194 (2009).  Congressional intent to preempt state law may be explicit in statutory provisions, or it may be implied.  *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 384 (5th Cir. 2004).  Here, Cessna does not argue that Plaintiffs' products liability claims are expressly preempted by the FAAct, but rather that the FAAct impliedly preempts the standard of care applicable to state law products liability claims.

The FAAct was enacted in the wake of several high-profile accidents, with the express purpose of "establish[ing] a new federal agency with powers adequate to provide for the safe and efficient use of the navigable airspace by both civil and military operations."  H.R. Rep. No. 85-2360 at 1 (1958).  The Act created the Federal Aviation Agency, which became the Federal Aviation Administration (FAA), and imbued it with regulatory authority over several aspects of the aviation industry.  Particularly relevant to this case is the FAAct's requirement that the FAA

Administrator "shall promote safe flight of civil aircraft in air commerce by prescribing . . .

minimum standards required in the interest of safety . . . for the design, material, construction,

quality of work, and performance of aircraft, aircraft engines, and propellers."  49 U.S.C. §

44701(a)(1) (2006).  Furthermore, the Act establishes a three-phase process for approving and

certifying the safety of an aircraft's design, manufacturing process, and operation.  *Id.* § 44704.

The District Court for the Eastern District of Texas recently explained this process as follows:

> Prior to manufacturing a new aircraft, a manufacturer must receive a "type
> certificate" indicating the FAA's approval of a plane's basic design and ensuring
> that the design complies with all applicable FAA regulations.  *See* 49 U.S.C. §
> 44704(a); 14 C.F.R. § 21.21.   Next, a manufacturer must obtain a "production
> certificate," which indicates that the FAA approves of the manufacturing process
> that will be used to construct the approved design.  *See* 49 U.S.C. § 44704(b); 14
> C.F.R. §§ 21.139, 21.143.   Finally, before a plane can be put into service, the
> owner of the aircraft must obtain an "airworthiness certificate" to prove the
> aircraft is in a safe operating condition and conforms to the type certificate.   49
> U.S.C. § 44704(c); 14 C.F.R. § 21.183.

*Monroe v. Cessna Aircraft Co.*, 417 F.Supp.2d 824, 833 (E.D. Tex. 2006).  Much of Cessna's

preemption argument relies on the extensiveness of this certification regime, and Cessna's

compliance with it.

The FAAct contains a savings clause that, when originally enacted, stated, "Nothing

contained in this Act shall in any way abridge or alter the remedies now existing at common law

or by statute, but the provisions of this Act are in addition to such remedies."  Federal Aviation

Act of 1958, Pub. L. No. 85-726, § 1106, 72 Stat. 731, 798 (current version at 49 U.S.C. §

40120(c) ("A remedy under this part is in addition to any other remedies provided by law.")).[1]

Although the FAAct did not originally contain an express preemption provision, when Congress

passed the Airline Deregulation Act (ADA) of 1978, it added a provision that expressly preempts

---

[1] The savings clause was amended without substantive change as part of the recodification of Title 49 "to eliminate unnecessary words and for clarity and consistency in the revised title and with other titles of the United States Code."  49 U.S.C. § 40120 note (Historical and Revision Notes).

state and local "law[s], regulation[s], or other provision[s] having the force and effect of law

related to a price, route, or service of an air carrier."  49 U.S.C. § 41713(b)(1).  Congress further

amended the FAAct by passing the General Aviation Revitalization Act (GARA) of 1994, which

added an eighteen-year statute of repose applicable to civil actions against certain aircraft

manufacturers for injury, death, or property damage arising out of accidents involving such

manufacturers' aircraft.  Pub. L. 103-298, § 2(a), 108 Stat. 1552 (codified at 49 U.S.C. § 40101

Note (2007)).[2]  GARA expressly preempts longer state law statutes of repose for such claims.

*Id.* § 2(d).[3]

      Against this backdrop, Cessna urges that implied preemption precludes Plaintiffs'

---

[2] GARA's general statute of repose states,

    (a) In general.--Except as provided in subsection (b), no civil action for damages for death or injury to persons or damage to property arising out of an accident involving a general aviation aircraft may be brought against the manufacturer of the aircraft or the manufacturer of any new component, system, subassembly, or other part of the aircraft, in its capacity as a manufacturer if the accident occurred--

      (1) after the applicable limitation period beginning on--

        (A) the date of delivery of the aircraft to its first purchaser or lessee, if delivered directly from the manufacturer; or

        (B) the date of first delivery of the aircraft to a person engaged in the business of selling or leasing such aircraft; or

      (2) with respect to any new component, system, subassembly, or other part which replaced another component, system, subassembly, or other part originally in, or which was added to, the aircraft, and which is alleged to have caused such death, injury, or damage, after the applicable limitation period beginning on the date of completion of the replacement or addition.

    (b) Exceptions.--Subsection (a) does not apply--

      (1) if the claimant pleads with specificity the facts necessary to prove, and proves, that the manufacturer with respect to a type certificate or airworthiness certificate for, or obligations with respect to continuing airworthiness of, an aircraft or a component, system, subassembly, or other part of an aircraft knowingly misrepresented to the Federal Aviation Administration, or concealed or withheld from the Federal Aviation Administration, required information that is material and relevant to the performance or the maintenance or operation of such aircraft, or the component, system, subassembly, or other part, that is causally related to the harm which the claimant allegedly suffered;

      (2) if the person for whose injury or death the claim is being made is a passenger for purposes of receiving treatment for a medical or other emergency;

      (3) if the person for whose injury or death the claim is being made was not aboard the aircraft at the time of the accident; or

      (4) to an action brought under a written warranty enforceable under law but for the operation of this Act.

49 U.S.C. § 40101, Note.

[3] This provision states, "This section supersedes any State law to the extent that such law permits a civil action described in subsection (a) to be brought after the applicable limitation period for such civil action established by subsection (a)."  *Id.*

products liability claims.  Implied preemption generally falls into two types: field preemption

and conflict preemption.  *See English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990).  Here,

Cessna invokes only the former.  Under the doctrine of field preemption, "state law is pre-

empted where it regulates conduct in a field that Congress intended the Federal Government to

occupy exclusively."  *English*, 496 U.S. at 79.  Such intent may be inferred from a scheme of

federal regulation "so pervasive as to make reasonable the inference that Congress left no room

for the States to supplement it, or where an Act of Congress touche[es] a field in which the

federal system will be assumed to preclude enforcement of state laws on the same subject."  *Id.*

(alteration in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947))

(internal quotation marks omitted).  However, where the field that Congress is said to have

preempted "includes areas that have 'been traditionally occupied by the States,'" *id.* (quoting

*Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)) (internal quotation marks omitted), courts

"'start with the assumption that the historic police powers of the States were not to be superseded

by the Federal Act unless that was the clear and manifest purpose of Congress.'"  *Wyeth*, 129 S.

Ct. at 1194–95.

As an initial matter, the parties dispute whether the presumption against preemption

applies here.  Cessna argues that there is a presumption *in favor* of preemption in this case

because "the States have never 'traditionally occupied' the field of air safety regulation," a field

which, Cessna claims, is "inherently federal in character."  (Def.'s Br. 7.)  However, this

argument misunderstands the principle underlying the presumption against preemption.

Courts "rely on the presumption [against preemption] because respect for the States as

'independent sovereigns in our federal system' leads . . . [courts] to assume that 'Congress does

not cavalierly pre-empt state-law causes of action.'"  *Wyeth*, 129 S. Ct. at 1193 n.3 (quoting

*Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).  Thus, "the presumption . . . accounts for the historic *presence of state law* but does not rely on the *absence of federal regulation*."  *Id.* (emphasis added).  For instance, in *Wyeth v. Levine*, 555 U.S. 555 (2009), the Supreme Court concluded that, even though "the Federal Government has regulated drug labeling for more than a century," the presumption was applicable to the Court's analysis of whether federal law preempted the plaintiff's state law claim that a drug manufacturer's FDA-approved label failed to warn consumers of certain risks.  *Id.* at 1195 & n.3.

Similarly, in *Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624 (1973), the Supreme Court found the presumption applicable to its analysis of whether the FAAct preempted local airport noise regulation.  *Id.* at 638.  Rather than focusing on the historic presence of federal regulation in regulating air travel, the Court focused on the presence of state law in regulating noise, finding that "[c]ontrol of noise is of course deep-seated in the police power of the States." *Id.*

Cessna, however, relies on *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), in which the Supreme Court did not apply the presumption in analyzing whether the plaintiff's so-called fraud-on-the-FDA claims were preempted by federal law.  *Id.* at 347.  In *Buckman*, the Court held, "[p]olicing fraud against federal agencies is hardly 'a field which the States have traditionally occupied,' such as to warrant a presumption against finding federal pre-emption of a state-law cause of action." *Id.* (citation omitted).

Here, the presumption against finding preemption applies, because state tort law has long been concerned with securing compensation for its citizens who sustain injuries caused by defective products.  *See Sprietsma v. Mercury Marine*, 537 U.S. 51, 69 (2002) (requiring "clear and manifest" congressional intent for implied preemption of state common law claims relating

to boat manufacturing).  Just as the federal government's long history of regulating pharmaceutical drugs did not dictate preemption in *Wyeth*, the history of federal regulation over air transportation does not detract from the states' long-standing role in ensuring product safety.  Moreover, unlike the fraud-on-the-FDA claims in *Buckman*, the common law products liability claims Plaintiffs pursue in this case are not specifically directed to the federal government's regulatory authority but, rather, seek to impose general duties on all product manufacturers and designers.  Thus, the presumption against preemption applies in this case, and the Court may only find preemption if "congressional intent to supersede [the common law standard of care for Plaintiffs' products liability claims is] clear and manifest."  *English*, 496 U.S. at 79.

Cessna argues that even if there is no presumption in favor of preemption here, Plaintiffs' claims are nevertheless preempted because the field of aviation safety, or at least the particular area of protection of aircraft from icing, is occupied exclusively by the federal government.  In light of the FAAct's savings clause, Cessna does not contend that the Act completely bars state law causes of action against aircraft manufacturers; rather, Cessna asserts that only the state-law standard of care is preempted by federal law.  In Cessna's view, then, state-law suits may still be brought for injuries and damage sustained due to defects in aircraft design, but only to vindicate violations of ***federal*** standards.  In this case, Cessna asserts that its compliance with the federal standard of care for aircraft design is conclusively established by the FAA's issuance of a type certificate for the aircraft in question.

Neither the Supreme Court nor the Fifth Circuit has held that the entire field of aviation, or that of air safety, is impliedly preempted by the FAAct.  Both courts, however, have found specific areas of aviation preempted.  In *Burbank*, the Supreme Court held that the FAAct preempted a city ordinance that made it unlawful for jet aircraft to take off from the Hollywood-

Burbank Airport between 11:00 p.m. and 7:00 a.m.  411 U.S. at 625–26.  The Court reviewed the

FAAct's requirement that the FAA prescribe "rules and regulations . . . for the control and

abatement of aircraft noise," and also examined the extensive and particularized regulations and

standards enacted pursuant to that statutory mandate.  *Id.* at 627–35.  Ultimately, "[i]t [wa]s the

pervasive nature of the scheme of federal regulation of aircraft noise that [led the Court] to

conclude that there [was] pre-emption."  *Id.* at 633.

The Fifth Circuit also has found implied field preemption in a specific area of aviation

safety.  *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380 (5th Cir. 2004).  In *Witty*, the plaintiff, a

commercial airline passenger, suffered deep vein thrombosis (DVT) after a flight from Louisiana

to Connecticut.  *Id.* at 381.  The plaintiff alleged, among other things, that the airline was

negligent in failing to warn passengers about the risks of DVT.  *Id.*  The Fifth Circuit concluded

that field preemption was applicable because "there exists a comprehensive scheme of federal

regulation."[4]  *Id.* at 384.  Initially, the court observed that FAA regulations "include a general

federal standard of care for aircraft operators, requiring that 'no person may operate an aircraft in

a careless or reckless manner so as to endanger the life or property of another.'"  *Id.* (quoting 14

C.F.R. § 91.13(a) (2003)). The court then identified "a number of federal regulations governing

the warnings and instructions [that] must be given to airline passengers," such as the regulations

requiring placement of "no smoking" placards in lavatories, illumination of "no smoking" signs

during non-smoking flights, and the use of the "fasten seat belt" sign during various portions of

all flights.  *Id.*  The court also took note of the regulations that set out in detail the oral briefings

given by flight attendants to passengers, and the information that must be included in passenger

safety briefing cards.  *Id.*

---

[4] The court in *Witty* also held that conflict preemption applied.  366 F.3d at 385.  However, since conflict preemption is not implicated in this case, the Court does not describe *Witty*'s holding on that point.

These and other regulations led the court to conclude that "the federal regulatory requirements for passenger safety warnings and instructions are exclusive and preempt all state standards and requirements." *Id.* at 385.  In support of this conclusion, the court stated that "Congress enacted a pervasive regulatory scheme covering air safety concerns that includes regulation of [passenger] warnings and instructions." *Id.*  The court, however, carefully cabined its holding to the facts before it:

> Ultimately, we need not decide whether a state claim for failure to warn passengers of air travel risks is entirely preempted, or, as another circuit has held, is preempted to the extent that a federal standard must be used but that state remedies are available.  We hold that, at a minimum, any such claim must be based on a violation of federally mandated warnings.

> Finally, we note our intent to decide this case narrowly by addressing the precise issues before us.

*Id.* (footnote omitted) (citing *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 376 (3d Cir. 1999)).  Because warnings about the risk of DVT were not mandated by the FAA, the court held that the defendant could not be liable for failing to provide such warnings.

The Third Circuit reached a broader conclusion in *Abdullah v. American Airlines, Inc.*, 181 F.3d 363 (3d Cir. 1999), finding "implied federal preemption of the entire field of aviation safety." *Id.* at 365.  There, the plaintiffs sustained serious injuries as a result of turbulence during a flight, and claimed the pilot and flight crew were negligent in failing to avoid the turbulent conditions or to give warnings to permit the plaintiffs to protect themselves. *Id.*  The court conducted an extensive review of the FAAct and its legislative history, noting that, in enacting the FAAct, "Congress found the creation of a single, unitary system of regulation vital to increasing air safety." *Id.* at 368.  Particularly convincing to the court was the following statement from the Act's Senate Report:

> [A]viation is unique among transportation industries in its relation to the federal

government—it is the only one whose operations are conducted almost wholly within federal jurisdiction, and are subject to little or no regulation by States or local authorities. Thus, the federal government bears virtually complete responsibility for the promotion and supervision of this industry in the public interest.

*Id.* (quoting S. Rep. No. 85-1811, at 5 (1958)).  In the Third Circuit's view, then, the FAAct's "legislative history revealed[ed] that Congress intended the [FAA] Administrator . . . to exercise sole discretion in regulating air safety." *Id.* at 369.

Moreover, the court in *Abdullah* observed that the FAA has implemented a comprehensive system of rules and regulations to effectuate its broad authority to regulate air safety, including regulation of pilot certification, pilot pre-flight duties, pilot flight responsibilities, and flight rules.  *Id.*  Also of importance to the court's decision was the recognition by several federal courts, including the Supreme Court, of the FAAct's focus on airspace regulation.  *Id.* (citing *Burbank*, 411 U.S. at 639; *Air Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 894 (2d Cir. 1960); *Kohr v. Allegheny Airlines, Inc.*, 504 F.2d 400, 403 (7th Cir. 1974); *British Airways Bd. v. Port Auth.*, 558 F.2d 75, 84 (2d Cir. 1977)).  Guided by these judicial interpretations and the legislative history of the FAAct, the Third Circuit concluded that Congress's intent was to federally regulate aviation safety and that, therefore, "*any* state or territorial standards of care relating to aviation safety are federally preempted."  *Id.* at 371.

Apparently aware that the breadth of its holding exceeded those of the Supreme Court and other circuits, the Third Circuit explained that its conclusion was simply a logical extension of the reasoning of those "decisions in which courts found federal preemption of discrete, safety-related matters, such as airspace management, flight operations, and aviation noise."  *Id.*  ("[I]t would be illogical to conclude that, while federal law preempts state and territorial regulation of matters such as pilot licensing, it does not preempt regulations relating to the exercise of the

specific skill for which licensing is necessary—pilots' operation of aircraft.").  The court found

further support for its "move from specific to general" in the regulations' general standard of

care for aircraft operation: "No person may operate an aircraft in a careless or reckless manner so

as to endanger the life or property of another."  *Id.* (quoting 14 C.F.R. § 91.13(a)).  Based on this

provision, the court concluded that even in safety-related matters where Congress or the FAA

had not prescribed specific rules or regulations, there was no gap in the federal standards to fill

with a state common law standard of care.  *Id.* at 374.  Even so, the court held that the savings

clause limited the FAAct's preemptive effect to state standards of care, concluding that state tort

remedies were left in place, and that, therefore, "plaintiffs, who are injured during a flight as a

result of the violation of federal air safety standards, may have a remedy in state . . . law."  *Id.* at

376.

        Citing the holdings in *Burbank*, *Witty*, and *Abdullah*, Cessna asserts that "[t]he federal

government fully occupies the field of aviation safety, particularly in regard to the design

certification and operation of aircraft, where the federal interest and oversight is pervasive," and

that, therefore, "[w]hile state law remedies are preserved, the standard of care to be applied is

exclusively federal."  (Def.'s MSJ Br. 2.)  Like the court in *Abdullah*, Cessna emphasizes the

FAAct's goal of uniformity in aviation regulation and the broad regulatory authority vested in

the FAA.  Cessna notes that the FAA regulations comprise over 2,000 pages of detailed rules

governing pilot qualifications, airport operations, flight operations, and security procedures,

among other things.  Cessna places particular emphasis on the "multi-tiered system to ensure

compliance with the airworthiness standards," pursuant to which the FAA issues a type

certificate to approve an aircraft's design, a production certificate to ensure proper

manufacturing procedures, and an airworthiness certificate issued for each individual aircraft

before it can be operated.  *See* 49 U.S.C. §§ 44704(a)–(d).

After careful consideration of the Third Circuit's reasoned opinion in *Abdullah*, despite the inarguably expansive regulatory role occupied by the federal government in aviation safety, this Court cannot conclude that the Plaintiff's claims are preempted.  Neither the text of the FAAct, its legislative history, nor its associated regulations demonstrate a clear and manifest congressional intent to supersede the state law standard of care for common law products liability claims.

While Supreme Court and Fifth Circuit precedent make clear that state regulation of discrete areas of aviation safety can be and are preempted by the FAAct, extrapolating from those holdings a conclusion that the entire field of aviation safety is preempted is, in this Court's view, unwarranted.  At the outset, the fact that the Supreme Court and the Fifth Circuit—whose decisions bind this Court—both found it prudent to tailor their field preemption analyses to discrete areas of aviation suggests that this Court should take a similar path.  Additionally, the structure of the FAAct suggests varying levels of regulatory control over different areas of aviation safety.  For instance, the Act requires the FAA to prescribe "minimum standards required in the interest of safety" for aircraft design, construction, and performance, but requires the prescription of "*regulations and* minimum standards" in other areas, such as aircraft inspection and "other practices, methods, and procedures that the Administrator finds necessary for safety in air commerce."  49 U.S.C. § 44701(a) (emphasis added).  Thus, the FAAct seems to grant the FAA greater regulatory authority in some areas than others, suggesting that the Act's preemptive effect may also vary between areas.

The reasoning of *Abdullah* does not convince the Court to the contrary.  For instance, the Third Circuit, in explaining its "move from specific to general," stated that it would be illogical

to find federal preemption in the area of pilot licensing if the standard of care for performance by licensed pilots was not also preempted.  To this Court, it seems no more illogical to permit federal law to regulate licensure and state law to regulate conduct, than to allow federal law to dictate a standard of care and state law the remedy.  Perhaps extensive regulation in one area *suggests* the possibility that similar regulation may be imposed in another.  This, however, falls far short of demonstrating a clear and manifest intent to exclusively occupy all areas of a regulated field.

The Court is similarly not persuaded by *Abdullah*'s reliance on the federal regulation providing a general standard of care for aircraft operation as a basis for finding preemption of all air safety issues.  To be sure, this regulation, which provides a comprehensive standard of care for aircraft *operation*, may eliminate any gap that state law standards of care might fill regarding aircraft operation, but it does not suggest that no such gaps exist in other areas of aviation safety.  In fact, the provision's existence demonstrates the opposite—when the FAA wants to prescribe a general standard of care for a certain aspect of aviation safety, it knows how to do so.

In light of the restrained approach taken by the Supreme Court and the Fifth Circuit, as well as the structure of the FAAct, this Court cannot conclude that Congress clearly and manifestly intended the federal government exclusively to occupy the broad field of aviation safety.  This, however, does not end the Court's preemption inquiry.  It must still be determined whether the discrete area of aviation safety implicated by Plaintiffs' claims—mainly aircraft design and manufacture—is preempted.  The Court concludes that it is not.

Cessna focuses principally on the multi-tiered aircraft certification regime mandated by the FAAct and implemented by federal regulations.  As evidence of Congress's preemptive intent, Cessna points to language from GARA's legislative history that describes the

extensiveness of federal regulation in this area:

> Significant in this regard is the "cradle to grave" Federal regulatory oversight of
> the industry.  General aviation aircraft must meet rigid standards set by the
> Federal Aviation Administration.  Before any aircraft flies for the first time, it
> must be inspected and certified as airworthy by the FAA.  If the aircraft is to be
> produced in any number, it must meet a further set of FAA-prescribed criteria.

H.R. Rep. No. 103-525, at 5.

There can be no question that the FAAct and federal regulations impose numerous
requirements that must be satisfied before an aircraft may be manufactured or operated.
However, extensive regulation alone does not demonstrate a clear and manifest intent to
supersede the States' exercise of their police powers.  Rather, the scheme of regulation must be
"so pervasive as to make reasonable the inference that Congress left *no room* for the States to
supplement it."  *English*, 496 U.S. at 79.  Unlike the regulations at issue in *Burbank* and *Witty*,
the federal government's regulatory presence in the area of aircraft design and manufacture,
while extensive, leaves room for the States' traditional role of compensating injuries based on
common law products liability standards.

At the heart of the Supreme Court's holding in *Burbank* was the importance of uniform
and exclusive federal control of navigable airspace.  411 U.S. at 626–27.  The Court
characterized as fatal the concession by the Solicitor General, who argued against preemption,
that "as respects airspace management, there is pre-emption."  *Id.* at 627.  That concession was
fatal because ordinances preventing the takeoff and landing of jet aircraft during certain hours—
so-called curfews—affect airspace management by increasing congestion during the non-curfew
hours.  *Id.*  The Court further relied on legislative history showing that one of Congress's main
goals in authorizing noise-related regulation was to prevent cities and states from passing their
own regulations.  *Id.* at 636–37 (citing 118 Cong. Rec. 37,083 (statement of Rep. Staggers)).

Here, on the other hand, Plaintiffs' products liability claims do not implicate control over national airspace, and the concerns with uniform and exclusive control in airspace management therefore are not implicated in this case.

Furthermore, whereas the legislative history regarding noise-control regulation suggested a specific congressional intent to preempt state and local noise regulation, the legislative history on the subject of aircraft design and production does not.  To the contrary, the House Report to GARA states that "[t]he liability of general aviation aircraft manufacturers is governed by tort law," and "[w]hile the specific contours have ebbed and flowed, the public's right to sue for damages is ultimately grounded in the experiences of the legal system *and values of the citizens of a particular State*."  H.R. Rep. No. 103-525(II), at 3 (emphasis added).  For that reason, "Congress [chose] to tread very carefully when considering proposals . . . that would preempt State liability law."  *Id.* at 4.  It was with those concerns in mind that "the Committee voted to permit, in this exceptional instance, a very limited Federal preemption of State law."  *Id.*  "Rather than seeking to revise substantially a number of *substantive and procedural* matters relating to State tort law, as earlier legislative efforts would have done, [GARA] is limited to creating a statute of repose."  *Id.* (emphasis added).  Thus, "in cases where the statute of repose has not expired, State law will *continue* to govern *fully*, unfettered by Federal interference."  *Id.* at 6 (emphasis added).

The House Report for GARA strongly suggests that at the time Congress passed GARA, it understood state tort law, not the FAAct or its regulations, to govern products liability claims against aircraft manufacturers.  The legislative history further suggests that after passing GARA, Congress intended state tort law to continue to fully govern such suits, both on substantive and procedural matters, except as to the statute of repose.  This legislative history prevents this Court

from finding a clear and manifest intent to preempt state law.

 *Witty* does not compel a different conclusion.  There, as in *Abdullah*, the plaintiff's

failure-to-warn claim implicated the standard of care for aircraft operation—an area in which the

FAA has gone so far as to prescribe a general standard of care.  Furthermore, in *Witty*, the Fifth

Circuit stressed the importance of uniformity in flight warnings: "[T]he import of one warning is

diluted by additional warnings that might be imposed under state law."  *Witty*, 366 F.3d at 385.

In this case, however, aircraft operation and the concerns for uniformity that go with it are not

implicated.  In fact, in the area of aircraft design and manufacture requirements, the FAAct

empowers the FAA to create only "minimum standards," which seems to speak to a floor of

regulatory compliance.  49 U.S.C. § 44701(a)(1); *see also Monroe*, 417 F. Supp. 2d at 832–33.

 Finally, Cessna urges that the FAA's own view of preemption "should make a

difference," (Def.'s Br. 20 (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 883 (2000))),

citing filings from other cases that purportedly demonstrate the FAA's position, expressed

through the Attorney General, that "aircraft design requirements are preempted 'by exclusive

federal authority over the field of aviation safety (*Id.* at 21).  In so arguing, Cessna relies on the

Supreme Court's holding that courts should "give[] 'some weight' to an agency's views about

the impact of tort law on federal objectives when 'the subject matter is technica[l] and the

relevant history and background are complex and extensive.'"  *Wyeth*, 129 S. Ct. at 1201

(quoting *Geier*, 529 U.S. at 883).  However, it is "an agency's explanation of how state law

affects the regulatory scheme" that courts attend to; they do not "defer[] to an agency's

*conclusion* that state law is preempted."  *Id.*  Furthermore, "[t]he weight [a court] accord[s] the

agency's explanation of state law's impact on the federal scheme depends on its thoroughness,

consistency, and persuasiveness."  *Id.*

Here, Cessna cites three filings by the United States, each from a different case.  First is the Statement of Interest filed by the United States in *Air Evac EMS, Inc. v. Robinson*, 486 F. Supp. 2d 713 (M.D. Tenn. 2007), a case involving state regulations requiring emergency ambulance helicopters to have certain equipment not required by FAA regulations.  *See* Statement at 7, *Air Evac EMS*, 486 F. Supp. 2d 713 (No. 3:06-cv-00239), ECF No. 41-1.  There, counsel for the United States argued that Tennessee's regulations were expressly preempted by the ADA, and impliedly preempted under the doctrines of field and conflict preemption.  *Id.* at 9, 12, 16.

Second, Cessna cites the FAA's Brief in *City of Santa Monica v. FAA*, 631 F.3d 550 (D.C. Cir. 2011), in which the City appealed the FAA's conclusion that an ordinance banning certain categories of aircraft from operating at Santa Monica Municipal Airport was preempted. *See* Brief for Respondent, *City of Santa Monica*, 631 F.3d 550 (No. 09-1233).  In its brief, the FAA asserted that the FAAct "gives the FAA Administrator plenary authority for the regulation of air commerce in the interests of safety, security, and the development of civil aeronautics," and that "[a]ircraft design and operations are governed by strict federal certification rules and operating rules."  *Id.* at 4 (citations omitted).

Finally, Cessna cites the Statement of Interest filed by the United States in *Goodspeed Airport, LLC v. East Haddam Inland Wetlands & Watercourses Commission*, 681 F. Supp. 2d 182 (D. Conn. 2010), *aff'd*, 634 F.3d 206 (2d Cir. 2011), where a private airport argued that state environmental regulations prohibiting the airport from trimming nearby trees were preempted by the FAAct.  *See* Statement, *Goodspeed*, 681 F. Supp. 2d 182 (No. 3:06-cv-00930-MRK), ECF No. 112.  Although arguing against preemption, the United States noted that "[t]he FAA has established a comprehensive regulatory scheme in furtherance of [the FAAct's] commands,

governing inter alia, the certification of aircraft." *Id.* at 6.

Although only one of the three filings cited by Cessna was specifically made on behalf of the FAA, "[t]here is 'no reason to suspect that the [Attorney General's] representation of [the FAA's] views reflects anything other than the agency's fair and considered judgment on the matter.'" *Williamson v. Mazda Motor of Am., Inc.*, 131 S. Ct. 1131, 1139 (2011) (quoting *Geier*, 529 U.S. at 884) (internal quotation marks omitted).  Thus, the statements described above represent three recent and consistent statements by the FAA, asserting that the FAAct preempts the entire field of aviation safety, or at least the discrete area of aircraft design requirements.  Nevertheless, several considerations lead the Court to conclude that these statements do not demonstrate a clear and manifest preemptory intent on the part of Congress.

Although the three cited statements provide consistent views on the issue of field preemption, the government has not always taken that view.  In *Burbank*, the Solicitor General argued *against* field preemption of aircraft noise regulation, a position that is at least in tension, if not incompatible, with the view that products liability claims are preempted.  411 U.S. at 627.  Furthermore, the opinions expressed by the United States in the filings cited by Cessna do not provide the in-depth analysis of complicated regulatory requirements that draws on an agency's "unique understanding." *Wyeth*, 129 S. Ct. at 1201.  In fact, at least two of the filings—those in *Goodspeed* and *City of Santa Monica*—were submitted in cases wholly unrelated to aircraft design requirements, mentioning the topic only in a general manner.  Such "*conclusion[s]*" regarding preemption are not afforded deference. *See id.*  And although the third case, *Air Evac EMS*, involved facts somewhat analogous to this one, the United States' regulatory analysis focused primarily on rules for air ambulance services. *See* Statement of Interest at 13–14, *Air Evac EMS*, 486 F. Supp. 2d 713 (No. 3:06-cv-00239).  Given that the fact-intensive nature of

preemption analysis prevents "prior cases on pre-emption [from being] guidelines in the present

inquiry," *Burbank*, 411 U.S. at 638, neither should the FAA's opinion regarding preemption in

another scenario have much weight in determining the outcome here.

To sum up, in light of the FAAct's structure and legislative history, as well as the lack of

other evidence of clear and manifest congressional intent to preempt the field or air safety

generally or aircraft design in particular, the Court concludes that the FAAct does not preempt

the common law standard of care applicable to Plaintiffs' products liability claims.

B.      Common Law Fraud

Cessna also moves for summary judgment on Plaintiffs' fraud claim.  The elements of

common law fraud are (1) the defendant made a material representation; (2) the representation

was false; (3) when the defendant made the representation, he knew it was false or made it

recklessly without any knowledge of the truth and as a positive assertion; (4) the defendant made

the representation with the intent that the plaintiff should act on it; (5) the plaintiff acted in

reliance on the representation; and (6) the plaintiff thereby suffered injury.  *Baleares Link

Express, S.L. v. GE Engine Servs.–Dall., LP*, 335 S.W.3d 833, 839 (Tex. App.—Dallas 2011, no

pet.).

The Plaintiffs assert two theories of common law fraud.  One theory involves the testing

data that Cessna submitted to the FAA to obtain the type certificate for the C208B.  The

Plaintiffs allege that when Cessna conducted test flights necessary to certify the aircraft for flight

into known icing conditions, Cessna failed to measure or test a number of variables, the

measurement of which is required by federal regulations.  According to Plaintiffs, these failures

constituted fraudulent misuse of the delegated option authorization granted to Cessna by the

FAA,[5] leading to the improper and fraudulent certification of the aircraft for flight into known icing conditions.

Plaintiffs' other theory of common law fraud concerns re-training courses Cessna provided to pilots on flying the C208B in icing conditions.  Contained in the course materials was a series of charts, prepared by Cessna's training administrator, showing the effect of ice accumulation on the aircraft's performance; specifically, the effect on its rate of climb and maximum airspeed.  The Plaintiffs allege that the values in these charts were created out of "thin air" by Cessna's training administrator and, therefore, constituted false representations.

Although Cessna argues that both of Plaintiffs' fraud theories fail on multiple elements, the Court concludes that, regarding both theories, there is no genuine dispute of material fact as to the fourth element—intent to induce reliance—and the Court therefore does not address Cessna's other arguments.

Although privity between a plaintiff and defendant is not necessary to prove intent to induce reliance, mere foreseeability that a plaintiff might rely on the defendant's representations is not enough to show intent to induce reliance.  *Baleares Link*, 335 S.W.3d at 839.  In fact, "[e]ven an obvious risk that a third party will rely on a representation is not enough to impose liability."  *Id.*  Rather, "proof of intent to induce the plaintiff's reliance requires proof that the defendant knew of an especial likelihood that the particular plaintiff would rely on the defendant's representations."  *Id.* at 840.

In *Baleares Link Express, S.L. v. GE Engine Services–Dallas, LP*, 335 S.W.3d 833 (Tex.

---

[5] Delegated option authorization is a status the FAA may confer on manufacturers of certain types of aircraft and who meet certain requirements.  *See* 14 C.F.R. § 21.239 (2011); *see also* 49 U.S.C. § 44702(d) (providing the statutory authority for the FAA Administrator to "delegate to a qualified private person . . . a matter related to (A) the examination, testing, and inspection to issue a [type, production, and airworthiness] certificate . . . ; and (B) issuing the certificate").  The designated option authorization allows such a manufacturer to obtain new type certificates by performing its own testing and submitting the relevant information and data to the FAA.  14 C.F.R. § 21.253.

App.—Dallas 2011, no pet.), the plaintiff leased an aircraft that later suffered catastrophic engine failure due to a malfunctioning roller bearing, which had been installed by the defendant.  *Id.* at 835.  The defendant's installation of the roller bearing occurred more than three years before the plaintiff leased the plane.  *Id.*  In connection with the repairs, the defendant issued an FAA airworthiness approval tag for the engine.  *Id.*

In asserting a fraud claim against the defendant, the plaintiff relied on the defendant's statements, made in one of the airworthiness approval tags, that the engine was repaired in accordance with the manufacturer's manual and in accordance with FAA regulations.  *Id.* at 839. The defendant argued that neither statement could form the basis of a fraud claim because there was no evidence the airworthiness approval tag was issued to the plaintiff—in fact, the engine was under lease to a different lessee when the tag was issued.  *Id.*  Even assuming that the defendant knew the airworthiness approval tag would be reviewed and relied on by subsequent operators, the court held that such knowledge was "nothing more than evidence that unknown members of the aircraft industry might eventually rely on [the defendant's] airworthiness approval tag."  *Id.* at 840.  Such evidence, the court held, was not the "proof . . . of an especial likelihood that the *particular* plaintiff would rely on the defendant's representations" required under Texas law.  *Id.*

The holding of *Baleares Link* forecloses Plaintiffs' fraud theory regarding Cessna's testing and certification of the C208B for operations in icing conditions.[6]  At the time Cessna conducted its test flights and submitted its data to the FAA, it knew, at most, that some unknown pilots might eventually rely on the plane's certification when flying into known icing conditions.

---

[6] A federal court ordinarily follows an intermediate appellate court's decision, unless convinced by other persuasive information that the state supreme court would decide otherwise.  *See Norwood v. Raytheon Co.*, 414 F. Supp. 2d 659, 662-63 (W.D. Tex. 2006) (citing *Barfield v. Madison County*, 212 F.3d 269, 272 (5th Cir. 2000)).  To determine what the highest state court would decide, the federal court may consider "analogous decisions, considered dicta, scholarly works and any other reliable data."  *Id.* at 663 (quoting *Hollis*, 232 F.3d at 465).

As in *Baleares*, such knowledge does not constitute proof of an especial likelihood that Morris and Fleck would rely on the representations made by Cessna to the FAA.  Thus, there is no genuine issue of material fact as to Cessna's intent to induce Morris and Fleck to rely on Cessna's representations to the FAA or certification for flight into icing conditions as disclosed in the C208B's operating manual.

Similarly, Plaintiffs have failed to demonstrate the existence of a fact issue regarding their other theory of fraud.  Cessna cites the deposition testimony of Steve McNew, the Cessna training administrator who created the charts in question, in which he states that the values in the charts were intended to be demonstrative only, picked at random simply to demonstrate the effect of ice accumulation on an aircraft's performance.  (App. to Def.'s Br. Supp. Mot. Summ. J. 375–76, 379, 382 [hereinafter Def.'s MSJ App.].)  Further, Paul Pellicano, an aerospace engineer in the Small Airplane Directorate of the FAA, who reviewed the charts as part of a National Transportation Safety Board (NTSB) review, stated in his declaration that he considered the charts to be demonstrative and never relied on them as providing factual information.  (Def.'s MSJ App. 365.)

The Plaintiffs offer no evidence contradicting McNew's or Pellicano's statements, but only offer Morris's testimony that he attended one of the training courses where the charts were displayed.  (App. to Pls.' Mem. Opp'n Def.'s Mot. Summ. J. 201 [hereinafter Pls.' App.].)  Even assuming that such evidence creates a fact issue as to Morris's reliance on the chart, it does nothing to rebut the evidence produced by Cessna showing the chart was never *intended* to induce such reliance but was instead intended merely as a demonstrative aid.  The Plaintiffs, therefore, have failed to adduce evidence proving the existence of a genuine dispute of material fact as to Cessna's intent to induce Morris and Fleck's reliance on the chart prepared by McNew.

The undisputed evidence proves that reliance on the charts is unjustifiable as a matter of law. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 580 (Tex. 2001) (addressing the intent element of fraud and stating that "the claimant's reliance must be 'especially likely' and justifiable").

Because Cessna has shown the absence of a genuine issue of material fact as to both of Plaintiffs' common law theories, it is entitled to summary judgment on those claims.

C.      Punitive Damages

Cessna next argues that it is entitled to summary judgment on Plaintiffs' claim for punitive damages.  Under Texas law, punitive damages may be awarded only if a plaintiff proves by clear and convincing evidence that the harm for which the plaintiff seeks recovery is the result of fraud, malice, or gross negligence.  Tex. Civ. Prac. & Rem. Code Ann. § 41.003 (West, Westlaw through 2011 Sess.).  Since Cessna is entitled to summary judgment on Plaintiffs' fraud claims, only malice and gross negligence remain as possible bases for an award of punitive damages.

Texas law defines malice as "a specific intent by the defendant to cause substantial injury or harm to the claimant."  *Id.* § 41.001(7).  Gross negligence consists of two elements, one objective and one subjective.  The objective element requires that the act or omission complained of be one "which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others."  *Id.* § 41.001(11)(A).  The subjective element of gross negligence requires that the act or omission be one "of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others."  *Id.* § 41.001(11)(B).

Cessna argues that it cannot be liable for punitive damages for malice or gross negligence because it complied with all applicable regulatory standards for aircraft design and safety, as evidenced by the type certificate issued by the FAA.  The Plaintiffs contend that regulatory compliance does not preclude an award of punitive damages and, anyway, that Cessna did not comply with federal regulations in testing and certifying the C208B for operation in icing conditions.

Cessna does not cite any Texas cases, and the Court is aware of none, holding that regulatory compliance forecloses an award of punitive damages as a matter of law.  The only Texas case Cessna cites is *Miles v. Ford Motor Co.*, 922 S.W.2d 572 (Tex. App.—Texarkana 1996), *rev'd in part on other grounds*, 967 S.W.2d 377 (Tex. 1998).  But in *Miles*, the Texas Court of Appeals expressly did not decide whether regulatory compliance alone "should bar liability for punitive damages," and instead held only that the evidence of the defendant's regulatory compliance, "coupled with the other evidence showing that it made a careful study and decision on the safety of [its product], makes the jury findings of gross negligence and malice unsupported by factually sufficient evidence."  *Id.* at 589 n.7.

The only other case cited by Cessna on the issue is *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999), in which the Supreme Court held that an employer's good faith efforts to comply with Title VII precluded an award of punitive damages under that statute.  *Id.* at 544.  However, *Kolstad* dealt with a statutory provision that provides for an award of punitive damages where an employer engaged in discriminatory practices "with malice or reckless indifference *to the federally protected rights* of an aggrieved individual."  42 U.S.C. § 1981a(b)(1) (2006) (emphasis added).  As the Court noted, "[t]he terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal

law." *Kolstad*, 527 U.S. at 536.  Thus, good faith efforts to comply with Title VII bar an award of punitive damages not because regulatory or legal compliance generally bars such awards, but because Title VII's punitive damages provision focuses on knowledge of the law.  Thus, *Kolstad*'s reasoning has no application to this case.

Although the Fifth Circuit has not addressed the effect of regulatory compliance on an award of punitive damages under Texas law, the old Fifth Circuit addressed the issue under Florida law in *Dorsey v. Honda Motor Co.*, 655 F.2d 650 (5th Cir. 1981).  In reversing the district court's decision to overturn a jury's award of punitive damages, the Fifth Circuit cited authorities from several jurisdictions, stating,

> Generally speaking, compliance with regulatory standards may be admissible on the issue of care but does not require a jury to find a defendant's conduct reasonable.  [The defendant] offers no persuasive reason why compliance will as a matter of law be merely admissible on the issue of whether the defendant's conduct is reasonable but an absolute defense on the issue of whether its conduct is willful, reckless, or outrageous.

*Id.* at 656 (citations omitted) (citing, among others, Restatement (Second) of Torts § 288C; W. Prosser, *Handbook on the Law of Torts* § 36, at 203–04 (4th ed. 1971)).

Texas law provides that "compliance with regulatory standards does not necessarily absolve a manufacturer from ordinary liability for product defects or negligence." *Miles*, 922 S.W.2d at 589 n.7.  Like the defendant in *Dorsey*, Cessna has offered "no persuasive reason why compliance will as a matter of law be merely admissible on the issue of whether the defendant's conduct is reasonable but an absolute defense on the issue of whether its conduct is [malicious or grossly negligent]." *Dorsey*, 655 F.2d at 650.  Thus, proof of regulatory compliance does not foreclose, as a matter of law, an award of punitive damages.

Even so, the Fifth Circuit has repeatedly interpreted Texas law to hold that "[c]ompliance with government safety standards constitutes strong and substantial evidence that a product is not

defective." *Lorenz v. Celotex Corp.*, 896 F.2d 148, 150 (5th Cir. 1990) (quoting *Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1144 (5th Cir. 1985)).  Furthermore, although the court in *Mills* did not hold that compliance with regulatory standards conclusively foreclosed a punitive damage award, the court did hold that the defendant's reliance on and compliance with government standards in part justified reversing the jury's finding that the defendant acted with gross negligence and malice in designing, manufacturing, and marketing the product in question—a seatbelt restraint system:

> When a seller relies in good faith on the current state of the art in safety concerns, *and on conclusions by the governmental agencies charged with administering safety regulations in the area of its product that the product is not unreasonably dangerous*, it cannot be said to have acted with an entire want of care showing conscious indifference to the safety of the product users, or to have acted with conscious indifference to an extreme degree of risk. Nor can it be said that the seller acted "with a flagrant disregard for the rights of others and with actual awareness . . . that the act will, in reasonable probability, result in human death [or] great bodily harm."

*Mills*, 922 S.W.2d at 589 (emphasis added).  The court went on to note that "what sets gross negligence and malice apart from ordinary negligence is the culpable mental state of the defendant." *Id.*  Finding no evidence of such a mental state, the court held that the jury findings on gross negligence and malice were not supported by factually sufficient evidence and against the great weight and preponderance of the evidence, reversing and remanding the issues for a new trial. *Id.* at 590.

The holdings of the Fifth Circuit and the Texas Court of Appeals lead the Court to conclude that while evidence of regulatory compliance does not foreclose an award of punitive damages as a matter of law, such evidence may demonstrate the absence of a genuine dispute of material fact as to gross negligence and malice, thus obligating the nonmovant to produce evidence proving that a genuine dispute of material fact exists.

Here, Cessna has satisfied its burden as a matter of fact and law.  As evidence of its

regulatory compliance, Cessna offers the type certificate for the C208B, issued October 6, 1986.

(Def.'s MSJ App. 1092, 1095.)  A manufacturer like Cessna receives a type certificate only after

the FAA Administrator determines that the aircraft in question "meets the applicable

airworthiness, noise, fuel venting, and exhaust emission requirements."  14 C.F.R. § 21.247.

Cessna also relies on the declaration of Paul Pellicano, an aerospace engineer for the FAA who

participated in an FAA evaluation of the standards used to certify the C208B for flight into

known icing conditions.  (Def.'s MSJ App. 366.)  Pellicano declares that in 1997 and 2004, the

FAA reviewed the certification data for the C208B for flight into known icing conditions and,

both times, found that it had been properly certified under the standards that existed at the time

of certification.  (*Id.* at 366–67.)  Pellicano further declares that "[a]t no time has the FAA

determined that the [C208B] was improperly certified for flight into known icing conditions

under the standards that existed at the time of certification."  (*Id.* at 368.)

In response, Plaintiffs argue that the C208B was not properly certified for flight into

known icing conditions.  Plaintiffs rely on the fact that Cessna did not use a Forward Scattering

Spectrometer Probe (FSSP) to measure water-droplet diameter during test flights, which is a

variable necessary to test an aircraft for flight into known icing conditions.  *See* 14 C.F.R. pt. 25,

App. C.  The test aircraft was equipped with an FSSP, but it was not working on the day of the

test flights.  Despite knowing that the FSSP was not operational, Cessna conducted the test

flights anyway.  Plaintiffs also cite the deposition of William J. Rieke, a former NASA test pilot

who flew aircraft in icing conditions.  (Pls.' App. 192.)  Rieke testified that during his career at

NASA he never conducted any icing evaluation flights without an FSSP and that NASA would

cancel such a flight if the FSSP was not working.  (*Id.*)  Finally, Plaintiffs point to the deposition

testimony of Douglas R. Herlihy, the former Investigator-in-Charge with the NTSB, who testified that estimating water-droplet diameter without an FSSP was not, to his knowledge, an approved method of determining drop diameter at the time the C208B was certified, and that such estimation resulted in an inaccurate determination that the aircraft met all the prerequisites for certification.  (Pls.' App. 194.)

The Plaintiffs argue that Cessna's icing test flights were inadequate for another reason; that they did not achieve the required exposure to "liquid water content."  Specifically, Plaintiffs argue that "on three of the six test flights the liquid water content was well below the required exposure level," (Pls.' Mem. Opp'n Def.'s Mot. Summ. J. 31, ECF No. 93 [hereinafter Pls.' Br.]), citing the test flight report Cessna submitted to the FAA and the deposition of Robert Rice, one of Cessna's test pilots.  (Pls.' App. 37, 55.)

Finally, Cessna relies on the testimony of Cessna's former designated option authority administrator, Phillip Hendrick, who testified in his deposition that he would rely on Cessna's test pilots to obtain correct instrumentation, facilities, and equipment for test flights, without dictating how test flight results were reached.  (*Id.* at 58.)

However, contrary to Plaintiffs' argument and Mr. Herily's testimony that FAA regulations required the use of an FSSP to measure water-drop diameter, the FAA Advisory Circular governing aircraft ice protection that was in effect when the C208B was certified specifically states that other methods of determining droplet size were acceptable:

> The flight test aircraft should have instrumentation to determine water content or droplet size *or* a means of determining ice accretion rate and the extent of impingement from which these parameters can be established. . . . *Drop size can be approximated from the extent of impingement on any shape with known impingement characteristics or by other acceptable means*."

(App. to Def.'s Reply Br. Supp. Mot. Summ. J. 38 [hereinafter Def.'s Reply App.] (emphasis

added).)  In Cessna's test flight report, Cessna's test pilots noted that Cessna used the most conservative possible estimate of droplet diameter and that "actual [droplet diameter], based on wing leading edge impingement limits and post [sic] experience, was larger."  (Def.'s MSJ App. 41.)  In light of this evidence, combined with the FAA's own determinations, at the time of certification and after two separate reviews, that the C208B was properly certified, no reasonable jury could conclude that Cessna did not comply with FAA regulations when it conducted icing test flights without an FSSP.

As for the Plaintiff's contention that only three of the six test flights achieved the required liquid water content, Plaintiffs point to no evidence that anything more is required for compliance with FAA regulations.  Cessna disclosed the results of all six flights to the FAA in its flight test report, and the FAA determined that the report justified granting Cessna a type certificate.  Likewise, Plaintiffs point to nothing showing that Hendrick's limited role in directing the test flights demonstrates non-compliance with FAA regulations.

In sum, Cessna has produced evidence showing that it complied with all federal regulations in testing and certifying the C208B for flight into known icing conditions, and the evidence adduced by Plaintiffs is insufficient to create a question of fact as to such compliance.  Nevertheless, independent of the issue of regulatory compliance, Plaintiffs have produced evidence of the culpable mental state required to survive summary judgment on the issue of gross negligence.  Cessna equipped its test aircraft with an FSSP, demonstrating its own belief in its usefulness in testing for icing.  Furthermore, Rieke's testimony about NASA's practice of never test flying an aircraft for performance in icing conditions without an FSSP weighs in favor of permitting Plaintiffs to present the issue to the jury.  In other words, while Plaintiffs' evidence may not ultimately prevail at trial, the Court cannot conclude at this juncture that no reasonable

jury could conclude that Cessna was grossly negligent or malicious in testing and certifying the C208B for flight into known icing conditions.  Therefore, Cessna is not entitled to summary judgment on Plaintiffs' request for punitive damages.

D.      Breach of Warranty

        Cessna also argues that it is entitled to summary judgment on Plaintiffs' breach of warranty claims.  The Plaintiffs allege that Cessna made and breached certain express and implied warranties regarding the C208B.  Cessna argues that such claims are barred by the statute of limitations.  Texas law provides a four-year statute of limitations for breach of warranty claims, whether express or implied.  Tex. Bus. & Com. Code § 2.725(a) (West, Westlaw through 2011 Sess.).  The limitations period for an express or implied breach of warranty claim begins to run at the time of delivery.  *Id.* § 2.725(b); *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 435 (Tex. 1997).

        Cessna offers evidence showing that the plane flown by Morris and Fleck was delivered to Federal Express on October 14, 1987, more than twenty years before this lawsuit was filed. (Def.'s MSJ App. 1102.)  The Plaintiffs do not dispute this evidence; in fact, they do not respond to Cessna's arguments on this point at all.  Based on Cessna's summary judgment evidence, there is no genuine dispute that the statute of limitations on Plaintiffs' warranty claims has run. Therefore, Cessna is entitled to summary judgment on those claims as well.

E.      Joint Enterprise Defense

        Lastly, Cessna moves for summary judgment on its affirmative defense of joint enterprise.  Cessna alleges that Morris and Fleck were engaged in a joint enterprise when conducting the check flight and, therefore, any negligence on the part of one should be imputed to the other.  The essential elements of a joint enterprise under Texas law are (1) an agreement,

express or implied, among the members of the group; (2) a common purpose to be carried out by

the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an

equal right to a voice in the direction of the enterprise, which gives an equal right of control." *St.*

*Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002) (quoting *Shoemaker v. Whistler's Estate*,

513 S.W.2d 10, 16–17 (Tex 1974) (quoting Restatement (Second) of Torts § 491 cmt. c (1965))).

Cessna asserts that there is no genuine dispute of fact as to any of these elements and that,

therefore, it is entitled to summary judgment on its joint enterprise defense.  The Plaintiffs

challenge elements two, three, and four, arguing that a genuine dispute of fact exists as to each.

Because the Court finds the third element—community of pecuniary purpose—dispositive, it

does not address the other elements.

A community of pecuniary interest requires more than a common business or pecuniary

interest.  *Wolff*, 94 S.W.3d at 527.  To satisfy the third element of joint enterprise, the pecuniary

interest must be "one shared without special or distinguishing characteristics." *Id.* at 531

(internal quotation marks omitted).  Further, the interest must be *in the group's common purpose*.

*Id.* at 528.

In *St. Joseph Hospital v. Wolff*, the Texas Supreme Court explained this element, using

the relationship between franchisor and franchisee as an example.  *Id.* at 527.  Although both a

franchisor and franchisee benefit from increased sales, their interests in the common purpose of

selling their product have special or distinguishing characteristics:

> The franchisee benefits from receiving the income and any resulting profits
> generated by its sales and by the market value of his or her franchise resulting
> from its profitability. The franchisor benefits by receiving royalty payments from
> its franchisee based on those sales and by the enhanced value accruing to its
> franchise opportunities resulting from the financial success of the existing
> franchises.

*Id.*  Likewise, the court in *Wolff* noted that wholesalers and retailers do not share a community of

pecuniary interest, despite their common interest in selling and marketing their products. *Id.*

Here, Cessna argues that Morris and Fleck's common purpose during their flight was to complete Morris's FAA-required check ride. The alleged pecuniary interest they had in this common purpose was their continued employment with Baron. According to Cessna, performing the check ride was part of Morris's and Fleck's duties as Baron employees and, therefore, Morris and Fleck shared in a community of pecuniary interest in the purpose of completing Morris's check ride.

Assuming, without deciding, that the common purpose shared by Morris and Fleck was completing the check flight, there was not a community of pecuniary interest among them in that purpose. While the duties of Fleck's employment may well have included acting as check pilot for other Baron pilots to complete their annual check rides, it is undisputed that Morris needed to do more than "complete" his check ride to continue his employment as a pilot with Barron—he needed to successfully complete it in order to continue to serve as a pilot. In other words, had Morris and Fleck completed the check ride without incident, but Fleck determined that Morris did not pass, only Morris's employment would have been in jeopardy. Morris and Fleck may have shared a common interest in completing the check ride, but Morris's pecuniary benefit was rooted in his *successfully* completing it, while Fleck's was not. Therefore, like the franchisor and franchisee discussed in *Wolff*, Morris's and Fleck's respective pecuniary interests had special and distinguishing characteristics.

Cessna has failed to demonstrate the absence of a genuine dispute of fact regarding the third element of its joint enterprise defense, and thus, it is not entitled to summary judgment on that defense.

IV.     CONCLUSION

For the reasons stated above, Cessna's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.  Cessna has shown that there is no genuine dispute of material fact as to Plaintiffs' fraud and breach of warranty claims, and the Court therefore grants summary judgment to Cessna on those claims.  However, because the Court concludes that the FAAct does not preempt Plaintiffs' products liability claims, Cessna is not entitled to summary judgment on those claims.  Likewise, Cessna has not met its burden on the third element of its joint enterprise defense, so it is not entitled to summary judgment on that issue.  Finally, Cessna has not established as a matter of law that Plaintiffs may not recover punitive damages.

**SO ORDERED**.

December 1, 2011.

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**